

570 Broad Street / Suite 1201 / Newark, NJ 07102
973.623.3000 Main / 973.623.0858 Fax / litedepalma.com

Newark / Philadelphia

May 3, 2024

**<u>VIA EMAIL and ECF</u>**
Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
Three Gateway Center
100 Mulberry Street
15th Floor
Newark, New Jersey 07102

        Re:   *U.S. ex rel. Silbersher v. Janssen Biotech Inc.*
                Civil Action No. 19-12107(MEF-CLW)

Dear Judge Arpert:

      Relator submits this letter in opposition to Defendants' April 26, 2024 letter seeking to quash notices of deposition addressed to Andrew Brackbill, Defendants' former Director of Pricing Strategy, who all Defendants listed their Rule 26(e) Supplemental Disclosures dated March 15, 2023, as having "discoverable information that J&J Defendants may use to support their claims or defenses." For Mr. Brackbill, Defendants represented that they believed he has relevant knowledge concerning two important issues in this lawsuit: Zytiga's pricing, and generic entry. Defendants also seek to quash the deposition notices of three witnesses who Defendants believe are protected by the "apex" witness doctrine.

      **I.**      **Background**

      The gravamen of this case is Relator's allegations that Defendants fraudulently obtained a patent (known as the '438 Patent) for their prostate cancer drug, Zytiga (abiraterone acetate), and used that patent to exclude generic competitors. After multiple rejections by the Patent Office because the claimed invention (*i.e.*, co-administering prednisone with Zytiga) was obvious, the Patent Office granted the '438 Patent based solely on Defendants' misrepresentations that the

496377.2

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 2

commercial success of Zytiga resulted from the claimed invention. *See generally*, December 17, 2021 Order Denying Motions to Dismiss, ECF No. 179, at 2-4, *citing* Second Amended Complaint ("SAC"), ECF No. 63.

Denial of Defendants' motion with respect to Mr. Brackbill is easy. There is no dispute that he possesses relevant knowledge. Defendants listed him in their initial disclosures with respect to two core issues in this case—which includes not only pricing, but generic entry. Indeed, Relator's Motion for *In Camera* Review of Documents Not Subject to Privilege Pursuant to the Crime-Fraud Exception (the "Crime-Fraud Motion") demonstrates precisely why Mr. Brackbill's role as Director of Pricing for Zytiga from 2007 to 2015—which gave him important responsibility over the long-range financial planning models that play an important role in Relator's proof—makes him a particularly appropriate witness. (*See* Crime Fraud Motion, at pp.17-18 & Exhibits 22-24 of the accompanying Declaration of Bruce Greenberg.) There is no question that the subpoena requiring Mr. Brackbill's deposition was timely, properly served, and procedurally correct. And there is no question that the apex doctrine does not apply to Mr. Brackbill.

Instead, Defendants bizarrely claim that Relator's attempt to depose Mr. Brackbill is "harassing." (ECF No. 341, at 20) That's simply without merit. Defendants have sued Mr. Brackbill because he left J&J to work for Pfizer. Defendants are the ones harassing Mr. Brackbill, not Relator. Relator has absolutely no intention of asking Mr. Brackbill about any of the employment issues over which Defendants are suing him. And if there were any questions concerning confidential information, there is a confidentiality order in this case that obviates any

496377.2

LITE DEPALMA
GREENBERG &
AFANADOR

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 3

such concern. Indeed, it appears that all witnesses in this case—the majority of which are *former* employees like Mr. Brackbill—potentially may testify on information that Defendants believe to be confidential. There is nothing that makes Mr. Brackbill's testimony special in this regard.

The *real* reason that Defendants are opposing Mr. Brackbill's deposition is the obvious one: Defendants *know* that Mr. Brackbill has relevant and important information based on his role of forecasting Zytiga's revenue and market share based on Loss-of-Exclusivity (LOE) assumptions, and he knows that those LOE assumptions were based on Defendants' internal beliefs that the '438 Patent was fraudulently obtained and would be invalidated. And because Defendants have sued him, Defendants don't want him to be deposed, because they suspect he may actually tell the full and unvarnished truth about Defendants' fraud. For all the other former employees that Relator has deposed or sought to depose, Defendants initially denied representing them, forcing Relator to personally serve subpoenas. Once those subpoenas were served, Defendants promptly stepped in, claiming that their attorneys would represent the former employees at their deposition—and in most cases demanding that the noticed dates be moved, creating havoc on the deposition schedule. Defendants did not object to any of these other depositions, because all of the witnesses thus far have agreed to be prepared and represented by Defendants' attorneys. This is the first time where the witness will be independently represented, and not controlled by Defendants. This is the *real* reason Defendants are trying to quash Mr. Brackbill's subpoena. Defendants don't actually think his testimony will be irrelevant or cumulative at all. The opposite is true. They fear his testimony will be right on target, and unfavorable to them.

496377.2

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 4

With respect to the witnesses that Defendant contend protected by the apex doctrine, Relator believes Robert Bazemore, Pearl Pugh, and Joaquin Duato each have unique, personal knowledge of the *real* reasons for Zytiga's commercial success—and that prednisone coadministration was not one of them (but in fact was a principal obstacle).

Before delving into the merits, Relator believes it important to address Defendants' argument rehashing the same tired, unsuccessful (because untrue) canard that: Defendants say that Relator has been too slow in taking discovery, with the implication that Defendants can disregard their Rule 26 obligations because Relator's discovery is too late for their preferences (and not too late under the rules or the Court's scheduling order). Relator refers to ECF No. 316, at 2-7 for a summary of the many delays in this case caused by Defendants' dilatory tactics. *See also* ECF No. 330, at 6-8 & n. 2. The Court's answer to Defendants' argument is the February 13, 2024 Order, which amended the discovery schedule. ECF No. 325. Defendants cannot simply disregard the Court's order by refusing to answer timely discovery propounded within those set deadlines.

Relator believes it's important to briefly set the record straight by emphasizing three points about Defendants' delay argument. First, contrary to what Defendants assert, targeted discovery in this case was effectively stayed (on Defendants' motion) until March 25, 2022. *See* ECF No. 193; *see also* ECF Nos.130 & 144, at ¶ 2(c). Second, even though Relator could go through a litany of unnecessary delays caused by Defendants, one particular example speaks volumes. After many months of delay, Defendants failed to identify the people in their commercial department who their patent prosecution attorneys supposedly communicated with to

**LITE DEPALMA**
**GREENBERG &**
**AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 5

substantiate their Commercial Success argument—which is the central issue in this litigation—until four months ago, in November 2023. ECF No. 316, at 2-3. Third, Relator seeks to depose less than 30 fact witnesses,[1] which is not unreasonable for a complex case of this size, with a potential liability exceeding $10 billion with trebling and statutory penalties. And Relator has suggested taking several witnesses off the deposition calendar (whom Defendants listed as having personal knowledge) if Defendants agreed that they would not introduce testimony from such witnesses at trial. Relator is still trying to obtain Defendants' reasonable agreement to that proposal.

  Moreover, beginning in November 2023 and continuing through February 2024, Defendants began amending their interrogatory answers and finding troves of previously unproduced documents that increased the number of people within J&J's business units whom Defendants' patent prosecution attorneys potentially communicated with from zero, to seven, and now potentially well over a dozen. And while Defendants say that "most" of the witnesses "have no firsthand knowledge of the disputed facts," Relator has asked on multiple occasions for Defendants to identify witnesses that they do not intend to call at trial so that they could be removed from the list. Defendants have thus far declined to provide any such information, so they cannot complain. Therefore, it is completely appropriate to insist that Relator be afforded the opportunity that Defendants have identified in their Rule 26 disclosure—and who Defendants refuse to confirm won't testify at trial on behalf of Defendants.

---

[1] Defendants list 16 individuals in their amended Rule 26(e) Supplemental Disclosures served March 15, 2023.

496377.2

LITE DEPALMA
GREENBERG &
AFANADOR

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 6

In any event, Defendants' accusations are of no moment to the material issues in their motion. The witnesses possess unique, personal knowledge of critical issues in this case, and under the liberal standards of Rule 26(b), their depositions are proper.

II.   **Andrew Brackbill Has Relevant Knowledge, and There is No Deficiency in His Deposition Notice**

Under the liberal standards of Rule 26(b), Mr. Brackbill's testimony is proper. Defendants listed him for two topics in their Rule 26(e) disclosures. Mr. Brackbill's central role in the financial forecasts incorporate LOE assumptions makes him an important witness. (*See* Crime Fraud Motion, at pp.17-18 & Exhibits 22-24 of the accompanying Greenberg Declaration). Defendants do not deny that his deposition subpoena deposition was timely or procedurally proper and served in accordance with Rule 45 in all respects.

In their motion, Defendants assert that Mr. Brackbill couldn't possibly possess relevant information because he was the director of pricing, and the damages period doesn't begin until after 2016. (ECF No. 341, at 18-19) Defendants' blinkered view of the relevant proof is simply wrong. To begin with, Defendants themselves say in their Rule 26 disclosures that Mr. Brackbill possesses relevant information concerning generic entry, not just pricing. And during his tenure, Mr. Brackbill was a critical player in *projecting* when generic competitors would enter the market, and the future effect of such entry on Zytiga's prices and market share. In particular, Mr. Brackbill's testimony may confirm that when Defendants forecasted future market share, revenue, and prices for Zytiga, they assumed the '438 Patent would be invalidated, proving that Defendants knew their commercial success argument lacked merit and couldn't survive scrutiny. Defendants' "base" *and* "upside" projections (for which Mr. Brackbill was responsible) assumed

496377.2

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 7

an LOE date that coincided with the expected date the district court was expected to render judgment in the underlying patent infringement actions (*i.e.*, sometime in 2017 and 2018)—and *not* when the patent term would have otherwise expired (2027). (*See* Crime Fraud Motion at 17-18 & Exs. 22-24 of the Greenberg Declaration.)

Defendants imply that Relator is harassing Mr. Brackbill because Relator only noticed his deposition after Defendants sued Mr. Brackbill for leaving his employment to work for a competitor. But this demonstrates why Mr. Brackbill's deposition is particularly appropriate—because he is more likely to provide candid and truthful testimony exposing Defendants' fraud.

Defendants complain that Mr. Brackbill was not on Relator's first round of deposition notices and subpoenas. But adjusting the deposition lineup is common in litigation, and especially complex ones. Parties uncover additional information during discovery, causing them to adjust their priorities. The same thing has happened here. Relator has agreed to *remove* two witnesses and suggested removing several additional witnesses from the deposition schedule because new facts suggest their testimonies may not be helpful. In Mr. Brackbill's case, discovery and other information have demonstrated that his deposition would be particularly probative and helpful, so the importance that Relator places on his testimony has been adjusted accordingly. Defendants can't quash a timely and properly served third-party deposition subpoena just because the witness was not in the first round of notices, and Defendants are afraid of what he may say.

496377.2

**LITE DEPALMA**
**GREENBERG &**
**AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 8

### III. Robert Bazemore Has Unique, Personal, *and* Superior Knowledge

Robert Bazemore, the former President of Janssen Biotech, is the most important witness of the three individuals who Defendants believe are protected by the "apex" doctrine.[2]

In this Circuit, it is "rare for a court to issue a protective order that prohibits a deposition. The party moving to quash the subpoena has a heavy burden of persuasion. Overall, a court must balance the non-moving party's interest in obtaining discovery and preparing for trial against the moving party's proffer of harm that would result from the deposition." *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 2:13-MD-02436, 2014 WL 3035791, at *2 (E.D. Pa. July 1, 2014) (cleaned up); *see also In re Transpacific Passenger Air Trans. Antitrust Litig.*, No. C-07-05634 CRB (DMR), 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014) (ordering deposition of airline CEO, limiting deposition to two hours and stating that "the burden under the apex principle is supplied by the general rule applicable to a party that seeks to avoid discovery in general") (cleaned up).

Given this, the apex doctrine should be applied only when "those at the top of the company . . . really don't have personal knowledge about what is going on with the product, or its marketing, or its financing or really anything else that might be of interest to the plaintiffs, or

---

[2] During the parties' last meet and confer, Relator and Defendants had agreed to table the depositions of Mr. Duato and Ms. Pugh until after additional depositions had been taken. This raises the question whether Defendants have complied with their meet and confer obligations under Civil Local Rule 37.1.

Regardless, because Defendants have pressed the issue with respect to Ms. Pugh and Mr. Duato now, Relator believes that their depositions should be ordered. For Mr. Duato, although the parties had not yet had the opportunity to meet and confer meaningfully on any limitations to his deposition, Relator is willing to agree to limit his deposition to three (3) hours.

**LITE DEPALMA**
**GREENBERG &**
**AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 9

the attorneys, or the jury, or the court." *In re Tylenol,* 2014 WL 3035791, at *2. Based on these baseline principles, the *In re Tylenol* court ordered the former President of a Johnson & Johnson subsidiary to testify at deposition without any time limitation when he "was involved in marketing during a highly relevant time period." *Id.* at *3 n.12.

As Defendants have acknowledged, Mr. Bazemore's deposition would be justified if he possesses "personal," "superior," **_or_** "unique knowledge." Here, he has all three. Mr. Bazemore was heavily involved in overseeing Janssen Biotech's efforts analyzing and implementing strategic initiatives to ensure the commercial success of Zytiga. Although Relator does not wish to provide Defendants with a roadmap of Mr. Bazemore's deposition, one representative example out of dozens of key documents that Relator has already identified for the deposition illustrates the likely importance of Mr. Bazemore's testimony. Mr. Bazemore made regular presentations that analyzed the factors contributing to the commercial success of Zytiga. *See, e.g.*, Exhibit B of Defendants' letter brief (ECF No. 341-2) (Long Range Financial Planning 2011 Presentation for the North American Leadership Team (NALT)—right before the application for the '438 Patent was filed.) This NALT presentation analyzed the strategic factors affecting the commercial success of Zytiga, and it suggests that prednisone coadministration was not a positive driver.

As Exhibit B demonstrates, Mr. Bazemore was the main presenter at this early 2011 NALT meeting. (ECF No. 341-2, at 3) He therefore possesses personal knowledge of a key presentation that Relator believes will likely play an important role at trial. Mr. Bazemore's knowledge is unique, because as the President of Janssen Biotech, he had a top-level view of the

496377.2

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 10

commercial success of one of the company's most important products. Because he was the main presenter, his knowledge concerning what this presentation means, why the information in it was curated and framed as it was, and whether that data in fact supports the Commercial Success Argument made by Defendants to the PTO is unique to him. His knowledge regarding this presentation is also superior to all others at the company, because he took a central role in delivering the presentation to Defendants' leadership team and thus had ultimate authority over the document. This type of testimony in a case of this nature—where the relevant issues were so important to the company that they commanded the attention of top management—cannot simply be replicated by, and is not redundant with, the testimonies of those lower in the hierarchy. Both types of testimony have their role to play here.

The NALT presentation is also not an isolated document. There were regular President Review Decks included in various annual and quarterly business plans and strategic analyses concerning Zytiga's commercial success throughout the relevant time period, and Mr. Bazemore either made those presentations himself, or they were presented to him as the President of Janssen Biotech. Mr. Bazemore's personal involvement is unsurprising, because this litigation concerns one of J&J's most important drugs—over $2 billion a year—which anchored Defendants' entire oncology business. Loss of patent exclusivity for Zytiga meant between $100 million to $150 million *a month* in lost revenue. Defendants' executives—including Bazemore, Duato, and Pugh—carefully watched and oversaw the efforts to maintain patent exclusivity for the drug; knew in great detail the *reasons* for Zytiga's "commercial success"; and understood

496377.2

Case 2:19-cv-12107-MEF-CLW   Document 344   Filed 05/03/24   Page 11 of 17 PageID: 5865

**LITE DEPALMA**
**GREENBERG &**
**AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 11

whether Zytiga's market share was attributable to the claimed invention (which was expected to extend Defendants' valuable drug monopoly for over a decade).

The courts in this Circuit have easily rejected the application of the apex doctrine in similar circumstances. In *Otsuka Pharm. Co. v. Apotex Corp.*, No. CIV.A.07-1000(MLC), 2008 WL 4424812 (D.N.J. Sept. 25, 2008), for example, a patent holder sued Apotex, a pharmaceutical company, for patent infringement. Apotex argued that the patent was invalid, among other reasons, based on obviousness. The President of a pharmaceutical company was ordered to provide testimony at a deposition because he would be expected to have knowledge concerning objective indicia of non-obviousness, such as "the commercial success, industry acclaim and long felt need for the product," which all were relevant to the question of patent invalidity. *Id.* at *4. That is similar to this case here.

Indeed, courts have explained why the apex doctrine is particularly inapposite to cases like this, which call into question important issues that executives of the company would be expected to know about. For example, in *In re: Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 16-cv-07321 (MAS) (LHG), 2021 WL 3140030 (D.N.J. July 7, 2021), the special master (Hon. Dennis M. Cavanaugh, U.S.D.J. (ret.))noted that the apex doctrine is geared towards cases "where the subject matter of the deposition would involve merely the company's 'day to day operations' or something manifestly immaterial in view of the total scope of the company's overall operations, such as slip-and-fall cases or a routine claim." Because the case involved issues of great importance to the company, the court ordered the deposition of the current CEO of Valeant Pharmaceuticals. *Id.* at *10. Similarly, in *In re Lincoln Nat'l COI Litig.*, No. 16-CV-6605-GJP,

**LITE DEPALMA**
**GREENBERG &**
**AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 12

2019 WL 7581176, at *3 (E.D. Pa. Dec. 5, 2019), the court denied the defendants' motion for a protective order under the apex doctrine in part because the case did not involve "an instance in which the matters in dispute in the litigation can be said to be so obviously trivial or far off (or beneath) the radar-screen of a high-ranking executive"; instead, the claims against the defendants were "quite meaningful in financial terms."

Defendants' cases mostly concern matters that were much less important to the total scope of the company's overall operations than the issue presented here. The more analogous cases are those in which the courts rejected the application of the apex doctrine and ordered the depositions to proceed, such as *Otsuka*, 2008 WL 4424812 (patent infringement presenting issues of validity, obviousness, and commercial success); *Valeant*, 2021 WL 3140030 (class action alleging securities fraud); *In re Tylenol,* 2014 WL 3035791 (multi-district litigation alleging claims of liver damage from the use of Tylenol and improper marketing); and *In re Lincoln,* 2019 WL 7581176 (class action involving improper cost of insurance practices in connection with a merger).

In contrast, the cases upon which Defendants rely generally involved individual claimants alleging things like the non-payment of disability benefits under specific policies, or employment discrimination, or simple breach of contract. While those cases were undoubtedly important for the individuals involved—and not to diminish the importance of such cases for individual human beings—nevertheless, it is unsurprising that the courts believed that the testimonies of top executives at the defendant companies in those cases would not be particularly helpful or appropriate compared with the burden on the executives and the sizable companies they

496377.2

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 13

represented. *See Ellena,* 2013 WL 4520200 (individual plaintiff alleging improper denial of disability benefits); *Klungvedt*, 2013 WL 551473 (same); *Younes*, 2015 WL 12844446 (franchisee/franchisor dispute); *Harapeti*, 2021 WL 8316391 (claim by freelance reporter and producer alleging gender and age discrimination as well as wage and overtime claims); *Mallory*, 2021 WL 2478473 (individual action alleging libel, slander, breach of contract, and unfair trade practices); *George*, 2020 WL 2745724 (individual action alleging workplace discrimination); *Ciarrocchi*, 2009 WL 10676631 (individual action alleging lump sum payment under a disability insurance policy); *Reif v. CNA*, 248 F.R.D. 448 (two individual plaintiffs alleging age discrimination).[3]

Finally, Defendants' own arguments suggest why the apex doctrine lies at its nadir when applied to Mr. Bazemore. Defendants acknowledge that one of the central policy reasons supporting the apex doctrine is that depositions of high-level officers "burden officers and the entities they represent," and that adversaries might try to exploit this to their "unfair advantage." But for a retired executive like Mr. Bazemore, the underlying policy reason for the apex doctrine is at its weakest.

---

[3] Defendants also cite to *Galmines*, 2015 WL 4973626, which was a *qui tam* alleging off label marketing and anti-kickback statute violations. This older decision was distinguished by *In re Lincoln*, 2019 WL 7581176, at *2, which pointed out that the testimony sought in *Galmines* was at best "remotely relevant" to the material issues in the case.

One of Defendants' cases also cited *Ford Motor Co. v. Edgewood Properties, Inc.*, No. CIV. 06-1278, 2011 WL 2517133 (D.N.J. June 23, 2011). That case involved a dispute concerning the distribution of contaminated concrete and the demolition and decommissioning of an old plant for which the Court believed that Ford's Executive Chairman, among other top-level executives, had no real knowledge, and that lower-level employees were more appropriate witnesses for the issues involved.

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 14

As the court explained in *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 126 (D. Md. 2009), "the apex deposition rule is intended to protect busy, high-level executives who lack unique or personal knowledge." Accordingly, because the former executive in that case was "no longer a busy corporate executive" but instead worked "a limited schedule," a deposition would "not interfere with any of his corporate responsibilities." *Ibid.*; *see also, e.g.*, *Van Den Eng v. Coleman Co.*, No. 05-MC-109-WEB-DWB, 2005 WL 3776352, at *2 (D. Kan. Oct. 21, 2005) (rejecting the application of the apex doctrine because the former executive no longer had "corporate responsibilities with which to interfere"); *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17 CV 50107, 2020 WL 1675593, at *4 (N.D. Ill. Apr. 6, 2020) (ordering deposition of former CEO and Chairman of the Board when defendant failed to show how the former CEO's "current employment status or responsibilities" would "impose an undue hardship," and distinguishing cases when the former executive currently maintained other significant corporate responsibilities).

The Court should therefore order the deposition of Mr. Bazemore to proceed.

**IV.  Defendants List Pearl Pugh in their Rule 26 Disclosures**

Defendants confirm that Pearl Pugh was the Director of Marketing for the Prostate Franchise from 2015-2017. Her marketing responsibilities for Zytiga are important because the marketing for Zytiga directly reflects what Defendants believed would drive the drug's commercial success and increase its market share. And Defendants must know that she has personal, unique, and superior knowledge on these issues. They produced 1,458 documents from her custodial files in this case, and double that when one includes relevant communications on

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 15

which she sent or was copied that were not in her custodial records. And in their Rule 26(e) Supplemental Disclosures dated March 15, 2023, Defendants *added* Ms. Pugh as an individual who likely had "Knowledge of Discoverable Facts J&J Defendants May Use to Support Claims or Defenses." And contrary to what Defendants now argue above—that Ms. Pugh had only "pricing-related responsibilities"—Defendants represented in their disclosures that Ms. Pugh also had relevant subject matter knowledge relating to "generic entry"—an important topic because the Commercial Success Argument concerns the reasons for Zytiga's competitive advantage and market share performance against potential generic competitors.

Defendants' arguments regarding Ms. Pugh are also contradictory. On the one hand, despite having listed Ms. Pugh in their disclosures and having produced a substantial number of documents from her files, Defendants protest that her deposition "is entirely inappropriate because she was not even hired by J&J until nearly two years *after* the alleged fraud at issue in this case." (ECF No. 341, at 14) But a few pages later, Defendants argue that her deposition is inappropriate because Relator has noticed the deposition of someone who became involved even *later* in time, *i.e.*, the individual who succeeded Ms. Pugh as Director of Marketing. Defendants cannot have it both ways, and their attempt to do so demonstrates the weakness of their arguments. In any event, Ms. Pugh's knowledge is relevant to this litigation, because the '438 Patent was not issued until September 2014. Defendants' marketing efforts to maximize Zytiga's commercial success, which sought to emphasize those aspects that gave it a competitive advantage over other treatments, would have been just as relevant in 2015 as in 2011, unless

**LITE DEPALMA**
**GREENBERG &**
**AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 16

Defendants can show that the drivers of Zytiga's commercial success radically changed during that time, and there is no indication that they did.

In short, Defendants' protests relating to Ms. Pugh are simply wrong, and they contradict what Defendants have actually said and *done* in this case (including searching her custodial files and producing over a thousand relevant documents). The Court should order her deposition to proceed.

### V.  Joaquin Duato Possesses Unique, Personal, *and* Superior Knowledge

Contrary to Defendants' assertions, Mr. Duato was not "several layers removed" from the events giving rise to this case. Instead, Mr. Duato personally delivered the investor presentation that became the centerpiece of Defendants' Commercial Success Argument, and that presentation will thus undoubtedly be a key exhibit at trial.

Specifically, one of the pivotal submissions that Defendants made to the Patent Office is a June 4, 2013 filing. *See* Order Denying MTD, ECF No. 179, at 4; SAC, ECF No. 63, at ¶¶ 82-84, 87. The Patent Office rejected the patent application numerous times because it was obvious. The Commercial Success Argument made by Defendants on June 4, 2013 was the *sole* reason that the patent was eventually granted. ECF No. 63, at ¶ 85.

The heart of the June 2013 submission was a "Pharmaceuticals Commercial Overview" that was personally presented by Joaquin Duato. *See* Exhibit A to Defendants' letter brief (ECF No. 341-1, at 2). In particular, the market share analysis reflected on page 17 of Exhibit A played a pivotal role in misleading the patent Examiner to grant the '438 Patent. ECF No. 63, at ¶¶ 84, 87.

**LITE DEPALMA GREENBERG & AFANADOR**

Hon. Douglas E. Arpert, U.S.M.J. (Ret.)
May 3, 2024
Page 17

    Relator reasonably believes that because Mr. Duato personally presented this key document to Defendants' investors, he was closely involved in its preparation and revision. Mr. Duato presumably also had final sign-off on this critical document. Defendants have never denied this or argued to the contrary.

    Therefore, Mr. Duato's understanding of what this presentation means, why the information in it was curated and presented in the way it was, and whether that data in fact supports the Commercial Success Argument made by Defendants to the PTO is unique to him. In addition, Mr. Duato, as the individual with ultimate authority over the document and as the person who presented it to the public, possesses knowledge regarding the presentation that is superior to all others at the company. Accordingly, Mr. Duato's deposition should proceed as noticed.

    Based on the foregoing, Your Honor should grant Relator's motion.

> Very truly yours,
>
> */s/ Bruce D. Greenberg*
>
> Bruce D. Greenberg

BDG:emp

cc:    All Counsel of Record (via ECF)

496377.2