## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, AND WASHINGTON; THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA; and THE DISTRICT OF COLUMBIA, | Civil Action No. 19-12107 (MEF) (SDA) *Document Electronically Filed* |
| *ex rel.* ZACHARY SILBERSHER, | |
| *Plaintiffs*, | |
| v. | |
| JANSSEN BIOTECH, INC., JANSSEN ONCOLOGY, INC., JANSSEN RESEARCH & DEVELOPMENT, LLC, and JOHNSON & JOHNSON, | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE EXPERT TESTIMONY OF ADAM E. BLOCK, PH.D.

Jaime L.M. Jones (*pro hac vice*)
Matthew C. Bergs (*pro hac vice*)
Joseph R. LoCascio (*pro hac vice*)
**SIDLEY AUSTIN LLP**
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Lauren Cranford Katzeff (*pro hac vice*)
Alaric R. Smith (*pro hac vice*)
**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Jeffrey J. Greenbaum
Gregory E. Reid
**SILLS CUMMIS & GROSS**
One Riverfront Plaza,
Newark, NJ 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500

*Attorneys for Defendants Janssen Biotech, Inc, Janssen Oncology, Inc., Janssen Research & Development, LLC, and Johnson & Johnson*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD ............................................................................................................ 3

SUMMARY OF OPINIONS .................................................................................................. 4

ARGUMENT ....................................................................................................................... 8

I.    Block's Opinion Is Based on a Reliable Methodology ..................................................... 8

      A.    Relator's first and second arguments misapprehend Block's testimony. ............... 9

      B.    There is no support for Relator's third and fourth arguments that Block must identify and quantify specific errors in the PDE data. ................................. 10

      C.    Relator's contradictory fifth and sixth arguments about Block's obligation to provide an alternative damages methodology both fail. .................................... 11

      D.    Contrary to Relator's seventh argument, Block is not obligated to review irrelevant datasets. .......................................................................................... 13

II.   Block's Opinions Fit This Case ................................................................................... 15

III.  Block's Opinions Should Not Be Excluded Even If Any of Relator's Experts' Opinions Are Excluded ............................................................................................... 17

CONCLUSION .................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Betterbox Commc'ns Ltd. v. BB Techs., Inc.*,
    300 F.3d 325 (3d Cir. 2002)............................................................................4, 9

*Complaint of Borghese Lane, LLC*,
    2023 WL 3114851 (W.D. Pa. Apr. 27, 2023)..........................................................12

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004) ......................................................................18

*Schneider ex rel. Est. of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003).................................................................................3

*FTC v. Innovative Designs, Inc.*,
    489 F. Supp. 3d 378 (W.D. Pa. 2020), *aff'd*, 2021 WL 3086188 (3d Cir. July
    22, 2021) ......................................................................................................18

*In re Generic Pharms. Pricing Antitrust Litig.*,
    2024 WL 4980784 (E.D. Pa. Dec. 3, 2024), *on reconsideration in part*,
    2025 WL 478178 (E.D. Pa. Feb. 12, 2025) ............................................3, 11, 16, 17

*In re Generic Pharms. Pricing Antitrust Litig.*,
    2024 WL 4989070 (E.D. Pa. Dec. 5, 2024)............................................................13

*Johnson v. Grays Harbor Community Hospital*,
    2007 WL 4510313 (W.D. Wash. Dec. 18, 2007) ....................................................18

*Kannankeril v. Terminix Int'l, Inc.*,
    128 F.3d 802 (3d Cir. 1997), *as amended* (Dec. 12, 1997) .............................14, 16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).......................................................................................4, 8

*Leonard v. Stemtech Int'l Inc*,
    834 F.3d 376 (3d Cir. 2016)...........................................................................14, 15

*Lindner v. Meadow Gold Dairies, Inc.*,
    249 F.R.D. 625 (D. Haw. 2008).........................................................................18

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)................................................................................3

*Olivero v. Trek Bicycle Corp.*,
    2018 WL 3459424 (D. Colo. July 18, 2018) ........................................................17

*Shoraka v. Bank of Am., N.A.*,
    2024 WL 3468756 (C.D. Cal. Jan. 18, 2024) ........................................................17

*United States ex rel. Spay v. CVS Caremark Corp.*,
    875 F.3d 746 (3d Cir. 2017)...............................................................................12

*United States ex rel. Spay v. CVS Caremark Corp.*,
    913 F. Supp. 2d 125 (E.D. Pa. 2012) ..................................................................12

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ...........3, 15, 16

*United States v. Chrzanowski*,
    502 F.2d 573 (3d Cir. 1974)...............................................................................17

*United States v. Ford*,
    481 F.3d 215 (3d Cir. 2007)...............................................................................15

*Walsh/Granite, JV v. HDR Eng'g, Inc.*,
    2020 WL 13876902 (W.D. Pa. June 15, 2020).....................................................13

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
    2021 WL 2352016 (E.D. Pa. June 9, 2021)................................................11,16, 17

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................11, 16, 17

**Other Authority**

Fed. R. Evid. 702 .................................................................................... *passim*

**INTRODUCTION**

Adam E. Block is a health economist with over 20 years of experience focusing on health policy issues including healthcare utilization, health insurance, and healthcare pricing. Leveraging his experience, training, and education, Block will testify as to four errors made by Relator's expert, Dr. David A. Hyman, in his reliance on Prescription Drug Event ("PDE") data and assessment of the Medicare Part D prescription drug program. Relator seeks an order excluding the entirety of Block's report under Federal Rule of Evidence 702. The arguments Relator advances in his Motion are inapt and unsupported and his Motion should be denied for three reasons.

*First*, Block utilizes a reliable methodology to conclude that PDE data do not accurately show relevant claims counts and payments. Block explains the limitations of PDE data, informed by his decades of relevant experience in healthcare policy and economics. Relator's argument that Block's opinions lack a reliable methodology conflicts with the law and relies on irrelevant and misleading characterizations of Block's opinion.

*Second*, Block's critiques of the PDE data are directly relevant to the issue of assessing damages in this case. Block's opinions are appropriately limited to rebutting Hyman's opinions and the sources he considered. Relator argues that Block's opinions are not tied to the facts of the case, but this argument misunderstands Block's opinion and assumes he is required to assess datasets unrelated to his analysis.

*Third*, Block's testimony is not excludable merely because he was designated as a rebuttal expert. Even if the Court were to exclude Hyman's testimony, Block's opinions remain admissible to rebut Relator's theories and evidence at trial. Courts routinely permit rebuttal experts to testify where, as here, they respond to an opposing party's theory of the case. Relator's premature effort

1

to exclude Block's opinions wholesale if Hyman's opinions are excluded is contrary to both precedent and the discretionary nature of rebuttal evidence.

Accordingly, the Court should deny Relator's Motion.

## BACKGROUND

If this case goes to trial, to recover on his novel claims that an alleged fraud by Defendants on the United States Patent and Trademark Office ("USPTO") somehow renders claims submitted by healthcare providers to the federal healthcare programs ("FHCPs") for Zytiga and alternative generic abiraterone acetate "false," Relator will have to show the jury the purportedly false claims for payment and quantify the damages (loss) to the FHCPs resulting from those claims. Relator offers his damages expert, Dr. Hal Singer, to opine on that issue. *See, e.g.*, Ex. 7, Singer Rpt. ¶¶ 5–6.[1] Relevant to this Motion, Singer's report relies on the PDE data to establish damages to one of the FHCPs—Medicare Part D. *See, e.g.*, *id.* ¶¶ 53, 73 & Figure 6. In turn, Singer relies on Hyman to attest to the reliability of the PDE data for that purpose. *See* Ex. 1, Hyman Rpt. ¶ 51.

Hyman opines that "the number of PDEs necessarily matches and reflects the number of claims that were submitted to the government" because a PDE "is generated every time a drug is dispensed and a claim for payment is initiated." *Id.* ¶ 47. Hyman concludes "that PDEs relating to abiraterone acetate in this case are [an] authoritative and reliable source of information for determining the number of claims for payment … , including the amounts paid for Zytiga and generic Zytiga for each such claim" for two reasons. *Id.* ¶ 51. First, Hyman asserts the PDE data are reliable because various government agencies and academics have used the PDE data for,

---

[1] As used herein, "Ex." refers to the Exhibits to the Declaration of Jeffrey J. Greenbaum in Support of Defendants' Motions to Exclude Expert Testimony of Relator's Experts, ECF No. 488, and its supplement, filed herewith, and "Relator's Ex." refers to the Exhibits to the Declaration of Bruce D. Greenberg in Support of Relator's Motions to Exclude the Opinions and Testimony of Defendants' Experts, ECF No. 487.

among other things, evaluating Medicare Part D spending and drug pricing.  ¶ 49.  Second, Hyman asserts that Singer determined the "the totals in the PDE data produced by CMS match the figures in the financial records produced … by [D]efendants."  ¶ 50.  Defendants retained Block to rebut that opinion.  Relator's Ex. H, Block Report ("Rpt.") ¶ 3.

## LEGAL STANDARD

An expert's testimony is admissible when (1) the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) the "expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Though all experts must meet this "trilogy of restrictions on expert testimony: qualification, reliability and fit," *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003), "rebuttal expert[s] need not necessarily produce a competing analysis to the methodology that they criticize."  *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784, at *14 (E.D. Pa. Dec. 3, 2024), *on reconsideration in part*, 2025 WL 478178 (E.D. Pa. Feb. 12, 2025) (collecting cases).

So long as the expert is qualified and provides reliable opinions that fit the case, mere disagreement with such an opinion is insufficient to warrant its exclusion.  *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000) ("The test of admissibility is not whether a particular scientific opinion … is demonstrably correct.").  Rather, such disagreement is best reserved for cross-examination.  *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactor[il]y weigh its inadequacies." (cleaned up)).

3

Where an expert is proffered to testify regarding non-scientific matters, "the relevant reliability concerns may focus upon personal knowledge or experience" of the expert. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *see Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (no error in admitting trademark expert's opinions "based on his personal knowledge or experience, rather than a methodology that satisfies the *Daubert* factors" (cleaned up)). Indeed, Rule 702 "expressly contemplates that an expert may be qualified on the basis of experience," which, in certain fields, "is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

## SUMMARY OF OPINIONS

Block has two decades of experience focused on health policy issues related to coverage and pricing of healthcare items and services. Rpt. ¶ 1. His scholarship has been published in numerous peer-reviewed academic journals and quoted in trade publications. *Id.* Block currently holds multiple academic appointments, where his work focuses on evaluating managed care plans and the efficient utilization of healthcare services. *Id.* ¶ 6. His previous employment includes positions with healthcare providers and insurers. *Id.* ¶¶ 8–9. He also served in Government as a Policy Economist at the Congressional Joint Committee on Taxation, specializing in health economics. *Id.* ¶ 7. Block received his B.A. in Neuroscience from Amherst College in 1999 and his Ph.D. in Health Policy from Harvard University in 2007. *Id.* Appx. A.

Block addresses certain inaccurate comments Hyman makes about the Medicare Part D program's structure. *Id.* ¶ 64. Hyman opines that the Medicare program's fraud response efforts focus on *ex post* review rather than *ex ante* detection. Ex. 1, Hyman Rpt. ¶ 80. He also alleges that Defendants "targeted" these "weaknesses" in Medicare's fraud response efforts. *Id.* ¶ 81.

4

Block analyzes the Part D program's structure, including the financial incentives and negotiating power of Part D plan sponsors and pharmacy benefit managers ("PBMs"), and concludes that Hyman misrepresents this structure. Rpt. ¶ 64. Block details how plan sponsors and PBMs can use formularies and other utilization management tools to control coverage and spending on drugs like Zytiga. *Id.* ¶¶ 65–66. Block concludes that these private entities' "continued willingness to pay for Zytiga, often across both Medicare and commercial markets, undermines the assertion that the price was universally unreasonable or that the healthcare system was blindly exploited." *Id.* ¶ 66. Although Relator purports to move to exclude Block's opinions "in their entirety," Relator's Motion does not address Block's Medicare Part D program structure opinions. Relator's Br. in Support of Mot. to Exclude Dr. Adam E. Block, ECF No. 478-1 ("Br.") 3.

Separate from his analysis of the Part D program's structure, Block also analyzes the limitations of PDE data and disputes Hyman's conclusions about their reliability. Rpt. ¶¶ 12–15. Block first explains the PDE data—PDE are summary reports that Medicare Part D plan sponsors submit to the Centers for Medicare & Medicaid Services ("CMS") for adjudicated prescription drug transactions. *Id.* ¶ 40. When a Medicare Part D beneficiary fills a prescription at a pharmacy, the pharmacy submits a claim for payment to the Part D plan at the point of sale; the Part D plan processes and pays the claim based on rates negotiated with the pharmacy. *Id.* ¶ 45. After the claim has been paid, the Part D plan submits PDE records to CMS containing various information, such as drug costs and plan payments. *Id.* ¶ 46. CMS uses these data for multiple purposes, including calculating premiums, assessing overall drug costs, and determining risk adjustment factors relevant to plan bids and reimbursement. *Id.* ¶¶ 40–44. CMS also utilizes these data for any necessary payment reconciliations, such as adjusting payments to Part D plans to account for

low-income cost-sharing subsidies or Direct and Indirect Remuneration ("DIR") fees.[2]  *Id.* ¶ 47. Block cautions that "PDE data is not used by CMS to reimburse health plans on a claim-by-claim basis." *Id.* ¶ 42. Thus, "PDE data serves as a reporting tool rather than a real-time claims processing system." *Id.* ¶ 47.

Block then offers three critiques of Hyman's opinions related to the PDE data. First, Block concludes that Hyman misrepresents how CMS uses PDE data. *Id.* ¶ 54. Hyman states that "PDEs are used to confirm the number and total costs for the drugs that were dispensed, and reconcile that total with the payments that were made to the plan sponsor during the prior year." Ex. 1, Hyman Rpt. ¶ 45. As Block explains, however, CMS "does not just compare the total costs to prior payments" to determine what is owed to the plan sponsors. Rpt. ¶ 56. Rather, CMS considers "*all applicable* remuneration," not just the "remuneration amounts that were estimated and applied at the [point of sale]" according to the PDE data. *Id.* (emphasis added). And that means that "CMS relies on additional reporting mechanisms, like the DIR report, to determine actual costs incurred." *Id.* Thus, Hyman "overstates the roles of PDEs in direct cost reconciliation," as CMS relies on much more than just the PDE data to perform its reconciliation process and make final payment determinations. *Id.* ¶ 57.

Second, Block concludes that Hyman inaccurately and misleadingly opines that PDE data accurately represent the number of claims to Part D plans for Zytiga and generic abiraterone acetate and the total reimbursements made on those claims. *Id.* ¶ 61. Hyman asserts that PDE data are an "authoritative and reliable source of information for determining the number of claims for

---

[2] DIR fees are rebates and discounts that Part D plans negotiate with pharmacies and drug manufacturers. Rpt. ¶ 53. Part D plans are required to submit DIR reports to CMS detailing information about these price concessions. *Id.* ¶ 56. This allows CMS to see the costs the Part D plans actually incurred when reimbursing covered prescription drugs. *Id.* ¶ 59. CMS utilizes these data from DIR reports and other sources when calculating payments to Part D plans. *Id.*

payment, with each generated PDE record reflecting an actual claim … , including the amounts paid for Zytiga and generic Zytiga for each such claim during the relevant period." Ex. 1, Hyman Rpt. ¶ 51. But Block explains how PDE records are not claims data. Rpt. ¶ 61. Unlike the databases Part D plans use to receive and process claims for payment of prescription drugs, PDE data "are not actual claims; instead, they are summarized reports of transactions submitted to CMS after a plan has adjudicated the claim." *Id.* As Block points out, "CMS itself states 'The PDE data are not the same as individual drug claim transactions.'" *Id.* That is material because "PDEs can be retroactively adjusted, so a single prescription might result in multiple PDE records if post-transaction adjustments … occur." *Id.* ¶ 62. In other words, where there might have been only a single claim for payment of Zytiga or generic abiraterone acetate submitted to Medicare Part D, Hyman would have a jury erroneously believe that multiple associated PDE entries reflect more than one claim. Block also explains that the "price in a PDE does not necessarily reflect the net cost due to the exclusion of post-sale rebates and DIR fees, making it an incomplete measure of a drug's actual cost." *Id.* ¶ 63. Thus, Block concludes that Hyman "overstates the reliability of PDE data" as a basis to determine the number of claims for payment or the total amounts reimbursed for those claims. *Id.*

Third, Block concludes that Hyman erroneously relies on PDE data when there are better sources of data available to determine claims volume and costs. *Id.* ¶ 60. Block explains that Hyman overlooks alternative datasets, such as the internal claims databases of Part D sponsors or PBMs, that are available and "more accurately reflect actual costs and payments in the Medicare Part D program." *Id.* Block also describes how CMS's reconciliation process incorporates additional information beyond PDE data, such as DIR reporting and financial audits. *Id.* Despite the fact that "more accurate and complete information exists, and is regularly used by industry

7

participants and CMS, than what is found in PDE data alone," Hyman ignores these data and unjustifiably relies on PDE data alone. *Id.*

## ARGUMENT

Block is clearly qualified to offer his opinions in rebuttal to Relator's attempt to rely on the PDE data to prove up false claims to the Medicare Part D program and the resulting damages and penalties—and Relator does not suggest otherwise. His opinions are based directly on his experience, and he explains how that leads him to the conclusions he draws; they are thus reliable. And because Relator's claims of purported fraud on the federal healthcare programs necessarily depend, in part, on the PDE data, Block's opinions regarding the reliability of those data are permissible even if Hyman's testimony is excluded.

## I.     Block's Opinion Is Based on a Reliable Methodology

Where, as here, an expert is proffered to testify regarding non-scientific matters, "the relevant reliability concerns may focus upon personal knowledge or experience" of the expert. *Kumho*, 526 U.S. at 150. Indeed, Rule 702 "expressly contemplates that an expert may be qualified on the basis of experience," which, in certain fields, "is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. When experts rely "primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.*

Block's opinions are based on a clear and reliable methodology: using his 20 years of relevant experience in healthcare policy and economics to explain how the Medicare Part D program works, the role that PDE data plays in that program, and the limitations of PDE data. Because this methodology is reliably based on his "personal knowledge [and] experience," *see Kumho Tire*, 526 U.S. at 150, Block's testimony is admissible in its entirety. *See also Betterbox*

8

*Commc'ns*, 300 F.3d at 329.   Relator argues that Block's methodology is flawed for seven reasons,[3] all of which fail.

### A.    Relator's first and second arguments misapprehend Block's testimony.

Relator's first two arguments, that Block concedes the PDE data are generally accurate and that the Government and others use the PDE data for various purposes, Br. 8–9, are beside the point and reflect a basic misunderstanding of Block's opinion.  Block's opinion is not that the PDE data are not reliable for *any* use or that they are not used for *some* uses.  Rather, Block's opinion is that the PDE data are not reliable for *the purpose* that Hyman claims they are—determining the number of claims to and payment by Medicare Part D for Zytiga and generic abiraterone acetate. *See* Rpt. ¶ 61 ("The claim that 'PDEs … are an authoritative and reliable source of information for determining the number of claims for payment' is misleading."); *id.* ¶ 63 ("The statement '[PDEs reflect] the amounts paid for Zytiga and generic Zytiga for each such claim during the relevant period[]' is incomplete and misleading.").  Thus, Block's so called "concessions" that the PDE data are generally accurate, and that the Government and others use PDE data for purposes other than calculating the number of claims to and payments made by CMS, are irrelevant to his opinions.  The fact remains that PDE data alone are not sufficient to determine the number of claims to and payments by CMS for Zytiga and generic abiraterone acetate dispensed to Medicare Part D beneficiaries. *Id.* ¶¶ 61, 63.

---

[3] Relator technically offers eight reasons, but the eighth reason is simply that Hyman is not offering an opinion "that Medicare claims are paid directly from PDE data," which Block and Defendants understood him to be offering based on his report.  Br. 11–12.  Defendants accept this concession without further rebuttal.

9

**B.     There is no support for Relator's third and fourth arguments that Block must identify and quantify specific errors in the PDE data.**

Relator next advances two arguments based on the premise that Block should be excluded as a rebuttal expert because he does not provide specific examples of errors in PDE data or quantify the magnitude of errors in PDE data, Br. 9–10, but this is a requirement that Relator imposes without support.  Block's opinion describes, based on over 20 years of experience, how PDE data may overcount the number of prescriptions dispensed and their costs. Rpt. ¶ 62 ("PDEs can be retroactively adjusted, so a single prescription might result in multiple PDE records if post-transaction adjustments … occur."), ¶ 63 ("[T]he price in a PDE does not necessarily reflect the net cost due to the exclusion of post-sale rebates and DIR fees, making it an incomplete measure of a drug's actual cost.").  Moreover, while Block does not quantify the precise magnitude of these inaccuracies, he explains that magnitude is "going to vary tremendously across the specific health plans" and that this wide variation occurs because different health plans have different "error rates or different ways of including data or not including data."  Relator's Ex. I, Block Deposition ("Dep.") 148:16–24.  He further explains that to determine the *precise* magnitude of inaccuracies in the PDE data for Zytiga and generic abiraterone acetate, one would need to develop a "master list of claims" from over 500 relevant health plans. *Id.* 150:19–151:14; 152:21–153:4.  And Block reliably bases that opinion on his experience and his "review[] of articles as well as other projects where [he] ha[s] reviewed the overall … differential between the number of dispenses or number of reported dispenses and then the number of drugs that are returned or double counted in error." *Id.* 54:15–55:8.

Because Block is a rebuttal expert, Rule 702 requires nothing more of him, including the empirical analysis that Relator suggests he was required to perform.  And that is because the expert he is rebutting—Hyman—employs a cursory methodology for assessing the reliability of the PDE

data that involves merely: (1) noting that other government and academic reports and studies assess PDE data; and (2) taking the word of Singer that the PDE data and financial records produced by Defendants match.  While Defendants have explained to this Court that such a methodology is unreliable, ECF No. 476-1 at 21–23, if the Court determines that it is reliable and Hyman's opinions are admissible, Block's opinions, which are premised on over 20 years of experience, are necessarily sufficient to rebut them.  Put differently, this Court cannot require Block to have conducted empirical analyses when Hyman did not either.  *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts."); *see also In re Generic Pharms.*, 2024 WL 4980784, at *14 ("[A] rebuttal expert need not necessarily produce a competing analysis to the methodology that they criticize.").

### C.    Relator's contradictory fifth and sixth arguments about Block's obligation to provide an alternative damages methodology both fail.

Relator makes two directly contradictory arguments about Block's consideration of alternative data sources, both of which fail.  First, Relator faults Block for allegedly not providing a better data source to identify the number of claims to and payment by Medicare Part D for Zytiga.  Br. 10–11.  As a preliminary matter, Rule 702 imposes no requirement on Block to offer alternatives that would cure the errors he identified in Hyman's analysis.  *See In re Generic Pharms.*, 2024 WL 4980784, at *14 ("[A] rebuttal expert need not necessarily produce a competing analysis to the methodology that they criticize."); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 2352016, at *14 (E.D. Pa. June 9, 2021) ("[R]ebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives.") (cleaned up); *In re Zyprexa*, 489 F. Supp. 2d at 285.  And of course Defendants in this case have

no obligation to offer any damages methodology; that burden likes solely with Relator. *Complaint of Borghese Lane, LLC*, 2023 WL 3114851, at *3 (W.D. Pa. Apr. 27, 2023) ("Here, the burden of proof on damages lies with Movants, and thus, Respondents are not obliged to offer an alternative calculation or methodology on reasonableness in said calculation.").

Relator's citation to the Third Circuit's decision in *Spay* for the proposition that the Third Circuit "suggested" PDE data can be used to determine claims counts, Br. 10–11, does not support his argument. Specifically, Relator argues that *Spay* "refer[s] to PDE data as 'claims' for payment." *Id.* (citing *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 749 & 764 (3d Cir. 2017)). Not true. The *Spay* court distinguishes PDE records from pharmacy claims for payment and makes clear that PDE data are only part of the overall process by which Medicare Part D processes payments. *See Spay*, 875 F.3d at 749 ("Processing payments and claims under Medicare Part D involves (1) the pharmacy claim, which the pharmacy submits to its PBM, and (2) the Prescription Drug Event ('PDE') record, which the Sponsor submits to CMS."). Moreover, *Spay* does not directly address the issue here: whether the PDE data accurately show the number of claims to and payments made by CMS for a prescription medication. *Spay* only describes the role that PDE records play in the payment process for a case involving a PBM defendant,[4] it does not undermine Block's conclusions. And in all events, *Spay* says nothing about whether PDE data

---

[4] *Spay* was premised on a distinguishable theory of fraud: implied false certification by a PBM. *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 146 (E.D. Pa. 2012). The *Spay* plaintiffs alleged that submitting accurate PDE data to CMS was a required condition for receiving payment from CMS and that defendants violated the FCA by submitting false PDE data to CMS. *Id.* Under that theory, each false PDE submission to CMS would constitute a false claim. *Id.* That is a separate theory from the present case, where Relator has not alleged (and could not allege) that Defendants submitted false PDE data to CMS. Instead, Relator alleges that Defendants' obtainment and enforcement of the '438 patent rendered false all claims for payment of Zytiga and generic medications submitted to the FHCPs. Under this theory, the relevant "claims" are medication reimbursement submissions, not PDE data submissions.

can be used to calculate FCA damages.  Thus, Block's opinion that PDE data cannot be used to calculate damages is not contradicted by *Spay*.  Rpt. ¶ 63.

Second, Relator argues, in direct contradiction of his first argument, that Block *does* offer a more reliable dataset but that it would not be feasible to develop—a critique that has no connection to the requirements of Rule 702.  Br. 11.  Specifically, Block describes how "Part D sponsors and PBMs maintain internal claims databases that go beyond the PDE summaries submitted to CMS" and he criticizes Hyman for "overlook[ing] the availability of [these] alternative datasets that more accurately reflect actual costs and payments in the Medicare Part D program."  Rpt. ¶ 60.  Block explains that an accurate number of claims could be calculated by analyzing the claims databases from over 500 health plans.  Dep. 150:19–151:14; 152:21–153:4; 167:14–23.  Relator cries foul at how burdensome that information may be to collect, but whether it would be burdensome to collect claims databases from health plans is irrelevant to Block's analysis.  Block is simply identifying a more reliable data source for calculating Medicare Part D claims and damages, which is admissible rebuttal testimony.  *Walsh/Granite, JV v. HDR Eng'g, Inc.*, 2020 WL 13876902, at *6 (W.D. Pa. June 15, 2020) (allowing rebuttal expert who "is opining that there is a better way to make a more accurate calculation"); *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4989070, at *18 (E.D. Pa. Dec. 5, 2024) ("*Daubert* does not require that an expert use [the opposing party's] preferred data or the best available data to be reliable …. [Such] criticisms go to the weight of his opinion.").

**D.    Contrary to Relator's seventh argument, Block is not obligated to review irrelevant datasets.**

Relator's next argument, that Block does not review internal Johnson & Johnson ("J&J") data that Block suggests could also be used to calculate claims numbers in this case, Br. 11, is inapposite.  As Block explained at his deposition, these J&J data show only "the times that it [*i.e.*

J&J] has been paid." Dep. 156:5–7.  These data do not show the number of claims to and payments made by CMS for Zytiga and generic abiraterone acetate dispensed to Medicare Part D beneficiaries.  *See id.*  While Block made a brief comment during his deposition that "J&J has access to the times that it has been paid and so that data is available," *id.*, he did not state that such data would show claims counts and payments made by CMS for Zytiga and generic abiraterone acetate.[5]  Instead, Block repeatedly made clear he considers these data to be outside the scope of his report and he did not review them.  *Id.* 156:12–13, 157:4–7.  Block also testified to another reason he does not review these data: Block is rebutting Hyman's opinion and Hyman does not review those data.  Dep. 280:8–25 ("[Q] Why didn't you think it relevant for you to interview personnel or to review defendants' own transaction data concerning reimbursements for Zytiga or abiraterone or sales of Zytiga or abiraterone to the federal government? A. So Dr. Hyman didn't do this, and my role was to basically confirm whether I thought Dr. Hyman's role was, opinion was correct or not.") (objection omitted).  Because Hyman does not review these data and Block is rebutting Hyman, these data are outside the scope of and irrelevant to Block's opinions.

Even if these data had some marginal utility, Block's decision not to review them would go to the weight of his testimony and could be explored on cross-examination; it would not be grounds for exclusion.  *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997), *as amended* (Dec. 12, 1997) ("It is for the jury to decide whether [one factor] outweighs the other factors relied upon by [an expert] and undermines his opinion.  This is an issue of credibility, not of admissibility."); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 391 (3d Cir. 2016) ("[A party's] disagreement with the calculation methodology and the underlying assumptions [an expert] made

---

[5] Outside of information related to sales for an authorized generic made by a subsidiary not named here, Defendants do not have payment data for generic abiraterone acetate sold by generic manufacturers.

14

… goes to the weight given to … testimony, rather than admissibility."); *In re TMI Litig.*, 193 F.3d at 692 ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactor[il]y weigh its inadequacies." (cleaned up)).

## II.    Block's Opinions Fit This Case

There is no doubt that Block's opinions fit the case, because they "speak[] clearly and directly to an issue in dispute in the case" and "will not mislead the jury."  *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (citation omitted).  Block's opinions directly address Hyman's opinion about the reliability of PDE data for counting the allegedly false claims to Medicare Part D and the total reimbursements for those claims.  Block's opinions will not mislead the jury because they are limited to rebutting Hyman's opinion and are based on the same data Hyman reviews.  Relator's arguments that Block's opinions do not fit the facts of this case all fail.

First, Relator incorrectly argues that Block's opinions are not tied to the facts of the case because his opinions about PDE data do not consider separate J&J data Defendants produced in this litigation.  Br. 12.  That argument fails for the same reason explained above—namely those data are irrelevant and Hyman also did not consider them.  While Relator counters that Singer reviewed those data, *id.* 13, that too is irrelevant because Block is rebutting Hyman, not Singer. Dep. 280:8–25.  And, while Hyman purports to rely on Singer's comparison of Defendants' transaction data to the PDE records as one basis for his opinion regarding the reliability of the PDE records, he did no independent analysis of those data.  Ex. 1, Hyman Rpt. ¶¶ 60–61.  So, naturally, neither does Block.  Relator also incorrectly asserts that by not reviewing the J&J data, Block is employing a methodology that "assumes his conclusion" and cannot be disproven.  Br. 14.  Block is clear that even in the unlikely event that the J&J data align with the PDE data, this would be

15

minimally relevant because the J&J data encompass a fraction of the full PDE data. Dep. 97:24–98:10. Relator may believe that Block should have placed more weight on the possibility that the J&J data align with the PDE data, but such disagreements are not grounds for exclusion. *See Terminix*, 128 F.3d at 808; *Leonard*, 834 F.3d at 391; *In re TMI Litig.*, 193 F.3d at 692.

Second, Relator wrongly argues that Block's opinion is not tied to this case because Block focuses on general inaccuracies in PDE data rather than specific inaccuracies in the PDE data at issue in this case. Br. 14. Block appropriately limits his opinions to generalizable critiques of PDE data because Hyman does not conduct any analysis specific to the PDE data at issue in this case. Rather, Hyman simply points to various examples of entities using PDE data as evidence that such data are reliable. Ex. 1, Hyman Rpt. ¶ 49. For example, he notes that "CMS uses the PDE data to prepare the information presented on multiple governmental websites" and "PDEs are also widely used by government agencies studying the performance of Medicare Part D" and "[a]cademics have similarly used PDE data for a wide array of empirical studies, published in peer reviewed journals." *Id.* No part of this analysis focuses on the specific PDE data at issue in this case. Accordingly, Block appropriately tailors his rebuttal opinion to match the scope of Hyman's analysis. To the extent Relator is arguing Hyman should have expanded his analysis beyond the scope of Hyman's analysis, this is not the role of a rebuttal expert witness. *See In re Generic Pharms.*, 2024 WL 4980784, at *14; *see also Winn-Dixie Stores*, 2021 WL 2352016, at *14; *see also In re Zyprexa*, 489 F. Supp. 2d at 285.

Third, Relator critiques Block for not analyzing whether post-sale financial adjustments can be gleaned from other data sets even if they are not included in the PDE data, Br. 14–15, but that analysis plainly falls outside of the scope of Block's opinions, which are limited to the PDE data. Rpt. ¶ 63. And, putting aside that Defendants' data capture post-sale rebate adjustments,

there are several other post-sale adjustments that Block discusses but neither Hyman nor Singer analyze.  *See id.*  These include DIR fees.  Although Relator criticizes Block for not quantifying the missing DIR fees, Br. 15, again, it was not his job to do so.  *In re Generic Pharms.*, 2024 WL 4980784, at *14; *Winn-Dixie Stores*, 2021 WL 2352016, at *14; *In re Zyprexa*, 489 F. Supp. 2d at 285.

### III.  Block's Opinions Should Not Be Excluded Even If Any of Relator's Experts' Opinions Are Excluded

In addition to his Rule 702-based arguments, Relator offers a premature and overbroad argument that "if any portion of Relator's affirmative expert reports to which Dr. Block responds (*i.e.*, Dr. Hyman) is excluded or not offered at trial, then the corresponding rebuttal opinion by Dr. Block should also be excluded."  Br. 15.  This request should be denied.

This Court has discretion to determine what evidence may be presented on rebuttal.  *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974).  And "[t]here is no rule that, at trial, a rebuttal expert may testify only in response to an affirmative expert's trial testimony."  *Olivero v. Trek Bicycle Corp.*, 2018 WL 3459424, at *2 (D. Colo. July 18, 2018).  Indeed, in a case like this—where Relator uses experts as a mouthpiece for his legal theories—courts have declined to exclude a party's experts solely because they were disclosed as "rebuttal" experts.  *Id.*, at *1 ("[T]here is still a theory to rebut, even if an affirmative expert will not testify in support of that theory."); *Shoraka v. Bank of Am., N.A.*, 2024 WL 3468756, at *2 (C.D. Cal. Jan. 18, 2024) ("[C]ourts have allowed rebuttal experts to testify in situations where the affirmative witness has been excluded when the rebuttal expert addresses an opposing party's case theories.").

In any event, Relator's request is premature because neither the Court nor the parties can anticipate, at this stage, what evidence Relator is going to elicit at trial.  And given that Relator is poised to advance his theories through evidence or testimony other than an excluded expert, his

request to strike unspecified expert testimony that may ultimately be responsive to a fact advanced in his case-in-chief is improper. *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (rebuttal testimony is proper "when it will explain, repel, counteract or disprove the *evidence* of the adverse party." (emphasis added) (cleaned up)); *see also* Br. 16 (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006), for same proposition). At bottom, Relator's request is an issue for the trial stage—not *Daubert*, which is the sole issue currently before the Court. *See* ECF No. 464 (referring *Daubert* motions to the Special Master for resolution by report and recommendation).

The cases on which Relator relies underscore this point. In *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625 (D. Haw. 2008), the court noted that "[t]he mere fact that Plaintiff designated only rebuttal experts" was "not sufficient grounds to strike [their reports] and exclude their testimony." *Id.* at 636. Instead, the court explained that whether the rebuttal experts would be permitted to testify, as well as the scope of that testimony, were issues to be determined at trial. *See id.* And in each of *FTC v. Innovative Designs, Inc.*, 489 F. Supp. 3d 378 (W.D. Pa. 2020), *aff'd*, 2021 WL 3086188 (3d Cir. July 22, 2021), and *Johnson v. Grays Harbor Community Hospital*, 2007 WL 4510313 (W.D. Wash. Dec. 18, 2007), the court merely limited the rebuttal experts of a *plaintiff* to providing testimony in rebuttal to the defendant's case, as opposed to in its case-in-chief. *See* 489 F. Supp. 3d at 396 (post-trial, refusing to consider rebuttal expert where plaintiff "repeatedly represented" in "witness lists, at the Final Pretrial Conference, and in its opening statement" that it would limit expert to rebuttal and defendants offered no expert testimony to rebut); 2007 WL 4510313, at *2 (limiting *pro se* plaintiff's rebuttal experts to testify only after defendant's case-in-chief). Far from supporting a premature motion to exclude Block,

18

these cases only confirm that Relator's request is best reserved for the trial stage, after his case is known.

## CONCLUSION

Relator's motion to exclude Block's opinions should be denied.

Dated: March 16, 2026

Respectfully submitted,
*/s/ Jeffrey J. Greenbaum*

Jaime L.M. Jones (*pro hac vice*)
Matthew C. Bergs (*pro hac vice*)
Joseph R. LoCascio (*pro hac vice*)
**SIDLEY AUSTIN LLP**
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Lauren Cranford Katzeff (*pro hac vice*)
Alaric R. Smith (*pro hac vice*)
**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Jeffrey J. Greenbaum
Gregory E. Reid
**SILLS CUMMIS & GROSS**
One Riverfront Plaza,
Newark, NJ 07102
Telephone: (973) 643-7000
Facsimile: (973) 643-6500

*Attorneys for Defendants Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, and Johnson & Johnson*

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffery J. Greenbaum, certify that on March 16, 2026, I electronically filed this document with the Clerk of Court through the Court's CM/ECF system, which served this document on all counsel of record.

Dated: March 16, 2026                    */s/ Jeffrey J. Greenbaum*

                                                    Jeffrey J. Greenbaum